**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Maxeau Balthazar,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 6230 |
| | ) | |
| **Southwestern Bell Corporation,** | ) | |
| **Illinois Bell Telephone Company,** | ) | |
| **Inc., and Martin Murphy,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maxeau Balthazar's ("Balthazar") complaint alleges causes of action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 § U.S.C. 2000e *et seq.*, against defendant Southwestern Bell Corporation ("SBC") doing business as defendant Illinois Bell Telephone Company, Inc. ("Illinois Bell")[1] (counts I and II) and under 42 U.S.C. § 1981 against Illinois Bell and defendant Martin Murphy ("Murphy") (counts III and IV, respectively). Count I alleges that Illinois Bell, through its agent Murphy, subjected Balthazar to "closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" based on his race, color, and nationality in violation of Title VII. Count II alleges that Illinois Bell discharged

---

[1]Although plaintiff names SBC and Illinois Bell as separate defendants, hereafter I refer to them collectively as Illinois Bell.

Balthazar based on his race, color, and nationality in violation of Title VII. Count III alleges that Illinois Bell engaged in "unwarranted harassment, including but not limited to closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" and prevented him "from enjoying the same rights to make and enforce contracts, as enjoyed by whites, non-Blacks and non-Haitians" in violation of § 1981. And count IV alleges that Murphy "interfered with and prevented plaintiff from enjoying the same rights as white citizens and non-Haitians to make and enforce contracts" in violation of § 1981. Illinois Bell and Murphy have moved for summary judgment on the complaint in its "entirety."[2] For the following reasons, the motion is granted.

I.

A number of the facts in this case are undisputed.[3] Where disputed, the facts are taken from the properly supported portions of the parties' Local Rule 56.1 statements.[4] Balthazar is a black

_____

[2]Defendants fail to specify which arguments correspond to which counts. I presume that defendants' arguments relating to the "discrimination" claims refer to counts II and IV, and their arguments relating to the "harassment" claims (which defendants construe as hostile work environment claims) refer to counts I and III.

[3]Many such facts are not supported or are not entirely supported by the citations to the record provided by defendants in their Local Rule 56.1 statement, but plaintiff did not object.

[4]Defendants submitted 132 statements of fact without leave of court to exceed the 80 permitted by Local Rule 56.1, but plaintiff

male citizen of Haiti who maintains residences in Port au Prince, Haiti and Evanston, Illinois. Balthazar attested that his native languages are French, Haitian, and Creole, and that he speaks English "with a discernable accent."[5] Illinois Bell is an Illinois corporation with its principal place of business in Cook County. Murphy is a white male who resides in Chicago. In 2001, Illinois Bell hired Balthazar as a splicer in one of its construction units. In 2003, Balthazar was transferred to Illinois Bell's Installation and Repair Group ("I&R Group") at the Northbrook Garage. In February 2005, Balthazar's employment was terminated.

The I&R Group is responsible for installing and maintaining telephone services for Illinois Bell's business and residential customers. Upon his transfer to Northbrook, Balthazar began working as a customer systems technician. Technicians assigned to the I&R Group are responsible for installing new phone service and responding to existing customers' calls regarding trouble with existing phone lines. Following customer requests for repairs, a technician is dispatched to inspect the problem and perform any necessary service.

Illinois Bell's central dispatch office was responsible for

---

did not object.

[5]Defendants dispute this fact by asserting that plaintiff "lacks personal knowledge as to how other people heard his accent." Defendants do not, however, cite any support in the record indicating that other witnesses did not hear plaintiff speak with an accent.

assigning each technician his work for the day. During the morning meeting, the managers would give the technicians a printed copy of the work they had been assigned. Donna Malick ("Malick") was initially Balthazar's manager, and subsequently Jeffrey Zielinski ("Zielinski") was his manager for a short period of time. In January 2004, Murphy was transferred to the Northbrook location, and Balthazar was reassigned to him. Because managers in the I&R Group often share duties, Balthazar was still periodically supervised by other managers, including Zielinski, after being assigned to Murphy's team. Murphy's and Zielinski's immediate supervisor was area manager Kathy Lombardo ("Lombardo"). Lombardo reported to area director Michael Hejl ("Hejl").

Upon his transfer to the I&R Group in 2003, Balthazar attended Illinois Bell's installation school for training. During Balthazar's first few days as a technician, he rode along with several other technicians before going out in the field alone. He observed the technicians' work and they explained how to perform various tasks. During his first few weeks as a technician, on March 28, 2003, then Training and Development Manager Murphy conducted a "ride-along" with Balthazar. Balthazar attested that Murphy "wrote me up during a training session for not knowing something [Murphy] was teaching me[,]" and that the company used this write-up as one of the bases for his termination. Murphy testified that he did not rely on the document created from his

4

ride-along to recommend Balthazar's suspension or termination. Murphy also testified that he did not recommend Balthazar's termination in February 2005, and he did not know who did. Murphy further testified that "a great number of the employee discussion forms" indicate that further incidents could lead to termination, but the ride-along form does not say that. Following this initial training, Balthazar attended periodic training classes. Balthazar also received ongoing training, including classes and daily instruction, coaching, and guidance from the I&R managers.

Defendants submitted the "I&R Technician Expectations Guide," the "Code of Business Conduct," the "Quality Standards Manual," and the "Bonding & Grounding Guru Booklet," which the parties agree outline Illinois Bell's rules and expectations for technicians' job performance.[6] Balthazar received copies of these documents.

The Technician Expectations Guide ("Guide") is a set of guidelines to help technicians maximize customer service while completing their daily assignments. The Guide includes general expectations as well as reliability, customer service, quality, and safety expectations. Any violation of the Guide can result in disciplinary action, up to and including dismissal. When Murphy was transferred to Northbrook in 2004, he reviewed the Guide with Balthazar and the other technicians in detail. Murphy read each

---

[6]Defendants did not cite to any support in the record laying the foundation for or otherwise explaining the content of these documents, but plaintiff did not object.

page of the Guide to the group, and gave the technicians the opportunity to ask questions.

The Guide provides that, if a job cannot be completed, then the customer and the manager must be notified. The Guide also provides that technicians must perform documentation related to each job they are assigned, and that such documentation must be complete and accurate. The documentation requirements include updating and closing out repair orders in the technicians' field laptop computer before leaving customers' homes. Upon completion of a job, technicians must accurately report the job's status in Illinois Bell's computer tracking system by entering certain codes indicating that the job has been completed (CMP), the job site was not accessible (NA), or the job is in jeopardy of not being completed by the end of the work day (JEP). Based on the completed job code, Illinois Bell presumes no further work remains. The Guide also provides that "Technicians must get overtime approved by the immediate manager; or if unavailable, the acting manager." Balthazar understood this to mean that he was required to obtain advanced approval for any overtime work.

The Quality Standards Manual ("Manual") contains guidelines relating to the performance of installation and repair tasks as well as customer service. The Manual instructs technicians to remove "cloth drops" - which is a brittle type of wire that Illinois Bell no longer uses as it can cause noise interference -

encountered on any job to which they are assigned. The Manual also advises technicians that they are responsible for the repair of all quality and safety defects encountered at any location to which they are assigned. The Manual also instructs technicians to ensure that all cables are bonded and grounded, to visually inspect wiring boxes for proper grounding sources, and to test for proper grounding where visual inspection is not possible. The Manual further provides that technicians are expected to clean up after themselves when working in and around customers' homes, and to notify customers if any damage to their property occurs. The Manual also stresses the importance of using accurate codes when entering repair data into Illinois Bell's computerized work dispatch system to ensure that trouble repaired is accurately reported and that Illinois Bell is aware of any work that is not completed.

The Code of Business Conduct ("Code") requires employees to maintain the highest standards of customer care and to engage in all required communications with the customers they service. Violations of the Code result in disciplinary action, up to and including dismissal.

The Bonding & Grounding Guru Booklet ("Booklet") reminds technicians that a ground tag must be attached to all ground wires. The Booklet warns not to use gas pipes or water pipes as a grounding source.

Illinois Bell evaluates technicians through quality inspections, job samples, reviews of work performed, and safety observations. Managers are expected to perform two quality inspections and two safety inspections per month for each technician. Managers document these inspections in an electronic reporting system called "WebAd." Defendants submitted a number of WebAd documents as evidence that, from February 13, 2004 to January 24, 2005,[7] "Murphy and Zielinski documented a total of eighteen separate incidents[8] which they believed constituted failures by Balthazar to meet the Company's performance standards."[9] Balthazar does not provide citations to the record disputing the statements

_____

[7] The incident dates are not entirely clear from the face of the documents alone, but do not appear to be disputed. Balthazar attested, however, that the information Murphy entered into WebAd was several days, weeks, or months old. Defendants admit to an occasional "slight delay," but cite no record support. Defendants acknowledge that the date of the entries appears on the face of the WebAd documents. It appears that plaintiff's representation regarding the delays is accurate, as my review of the "date" as well as the "created" and "modified" dates of the documents reveals possible delays of approximately one day, two days, three days, five days, six days, one week, two weeks, three weeks, one and one-half months, and two and one-half months.

[8] There are seventeen documents "created" by Murphy that identify Murphy as "Manager." There are three documents "created" by Zielinski that identify Murphy as "Manager," and one document "created" by Murphy that identifies Zielinski as "Manager."

[9] Defendants did not cite to adequate support in the record to lay a foundation for each of the WebAd documents, but plaintiff did not object. Moreover, without citations to any deposition testimony or affidavit regarding these documents, defendants' characterization of what the documents say in their Local Rule 56.1 statement is often difficult, if not impossible, to discern from the face of the documents alone.

of fact setting forth the following incidents:[10]  February 13, 2004

verbal warning by Murphy[11]; February 19, 2004 written warning by

Murphy[12]; July 1, 2004 inspection by Murphy in which he found

performance issues; September 16, 2004 customer complaint about

improper work, confirmed by Murphy upon inspection; October 25,

2004 performance issues documented by Murphy; and November 10,

---

[10]Plaintiff has not cited any support in the record to dispute these facts, but rather merely states that he does not agree that they are accurate.

[11]In responding to the statement of fact that Murphy and Zielinski documented eighteen incidents, plaintiff cites a page in his deposition in which he stated that he did not tell Murphy he was unclear about the "overrun" process.  Plaintiff provides none of the surrounding pages, and I cannot determine from the cited portion of the deposition transcript to what that statement refers.  Plaintiff also cites a portion of Murphy's deposition testimony that refers to the document defendants cite as the basis for the February 13, 2004 incident.  In the "Employee Response" section of that document, it states that "Max stated he was unclear about the over run process."  It appears that plaintiff attempts to dispute a comment attributed to him in this document, but does not otherwise dispute the substance of the incident or that an incident was documented.

[12]In responding to the statement of fact that Murphy and Zielinski documented eighteen incidents, plaintiff cites a page in his deposition in which he stated that he "did not" receive a copy of some unidentified document and he "did not have a chance to have my real response be in there."  Plaintiff's response indicates that it is "Regarding the Write up re: Dempster job."  The document defendants cite as the basis for the February 19, 2004 incident refers to a street address on Dempster.  But plaintiff provides none of the surrounding pages, and I cannot determine from the cited portion of the deposition transcript to what the statement refers.  Again, it appears that plaintiff attempts to dispute a comment attributed to him in this document, but does not otherwise dispute the substance of the incident or that an incident was documented.

2004[13] inspection by Murphy in which he found performance issues[14].

Defendants contend that Murphy issued Balthazar a final written warning on May 10, 2004 for deviating from performance standards on two separate jobs, including improper wiring and splicing and failure to attach ground tags to ground wires[15], and

---

[13]Plaintiff disputes this incident because "Murphy wrote up his report more than two (2) months after the alleged inspection." The document shows "Date: 11/08/2004" and "Created" and "Modified" on "01/25/2005[.]"

[14]Plaintiff cites portions of his deposition testimony to attempt to dispute this incident, but he does not include enough of the surrounding transcript from which to determine what his testimony concerns. All I can tell is that plaintiff testified that "[n]o one can tell" whether some pictures are of the address in question. He also testified that he has no way of knowing whether other technicians worked at the address in question after him; only the managers would know. The parties agree that no discipline was imposed in connection with this job.

[15]In responding to the statement of fact that Murphy and Zielinski documented eighteen incidents, plaintiff cites a page in his deposition in which he stated that "[s]o I can see there is no ground tag, but I cannot say it's my work, because I don't know if there is somewhere there is an address on the house." Plaintiff's response indicates that it pertains to "Another allegation concerns alleged work done at 7912 Oconto Street, Niles." But the cited portion of the transcript does not include the question to which plaintiff was responding or any of the surrounding pages, and I cannot determine from the cited portion of the deposition transcript to what that statement refers. Plaintiff also cites a portion of Murphy's deposition testimony that refers to two pages of a document defendants cite as the basis for this May 10, 2004 incident. Also in responding to the statement of fact that Murphy and Zielinski documented eighteen incidents, plaintiff cites a page in his deposition in which, in answering whether Murphy ever spoke to him regarding the wrong numbers being written on the NID on the Oconto job, he stated that "[f]irst of all, sir, that is not my handwriting[,]" referring to the numbers written on the sticker. Plaintiff's response indicates that it pertains to "the allegation that the wrong numbers were written on the NID on the house[.]"

a customer complaint that Balthazar had broken a ceiling tile while working in the customer's house.[16] Defendants assert that, upon inspection in response to the customer complaint, Zielinski confirmed that there was a broken ceiling tile in the area where work was being performed, and he also noted improper wiring work. Balthazar attempts to dispute that the wiring was improper, stating that he testified regarding a picture

> Sir, I see from that picture, I see black. Could be a
> cable, I don't know what it is. I see gray something,
> two gray wires, and some stuff in there. I'm not sure
> what they are . . . .

Defendants contend that on July 1, 2004 Murphy inspected two job sites Balthazar worked on the previous day. In addition to performance issues found at the one location as noted above, defendants claim that, at the other location, the customer reported Balthazar failed to advise him that the work was complete before leaving and Murphy found an active telephone line was improperly grounded. Defendants' characterization of this incident in their Local Rule 56.1 statement is impossible to discern from the face of the document itself. Balthazar likewise cites the Quality Inspection form ("QI") documenting this incident, which he claims indicates that the customer was very satisfied because the document

---

[16]Plaintiff states that his "response was that: 'Sir, my working with the company as a Tech, I don't ever recall breaking any ceiling tile from anybody's house[.]'" Although this appears to quote plaintiff's deposition testimony, no page citation was included.

states "Assured customer VERY SATISFIED OK[.]"[17]   It is also impossible to understand the significance of this phrase from the face of the document alone.

On August 3, 2004, defendants assert that Murphy and Hejl found a customer's lawn was littered with debris, a "cloth drop" wire was left in place rather than replaced, and there was improper wiring that resulted in a short preventing activation of the dial tone.   Balthazar disputes defendants' assertion that he left "refuse" in a customer's yard with his deposition testimony that technicians were required to "clean up [their] mess" and he "[a]lways cleaned up after myself."   Balthazar additionally attested that Murphy wrote him up for "insignificant matters and for errors made by other technicians[,]" including failing to pick up debris left on a customer's lawn by another technician. Balthazar cites the Employee Discussion Form ("ED") and the QI documenting this incident, which do not indicate that the mess was left by another technician.   Balthazar also disputes defendants' contention that he left a "single pair cloth drop" which he should have replaced with his deposition testimony that Malick told the technicians, "If you come to a single pair drop, it's working, it's good, leave it there . . . . "   Balthazar further testified that

---

[17]To the extent plaintiff's response to defendants' Local Rule 56.1 statement also relies on the WebAd documents, his characterization of the documents is likewise difficult, if not impossible, to discern from the face of the documents alone.

what was supposed to be done with a single pair drop "never changed in the meeting or anything until Mr. Murphy started writing me up for that . . . ."[18]

On September 8, 2004, defendants claim that Murphy found that a single pair cloth drop was not replaced and that a wire was grounded to a gas pipe on a job Balthazar performed one day earlier. Balthazar disputes that he grounded a wire to a gas pipe, citing his deposition testimony that "[n]o one is his right mind would" ground anything to a gas pipe "[b]ecause any electrical hazard, the thing would explode." Although not entirely supported by the record, Balthazar does not dispute that Murphy imposed a final written warning and one-day suspension for the August 3 and September 7, 2004 incidents.[19]

On September 14, 2004, defendants assert that the QI states that another technician found that wiring work Balthazar had done was performed incorrectly and reported it to Zielinski, who then inspected the job. Balthazar contends that, according to the QI, the job was "mostly O.K." It is impossible to understand the significance of the "OK" and "DEV" notations in the document without any citation to supporting deposition testimony or affidavit.

---

[18]The ED also indicates in the "Employee Response" section that, "You never said anything to me about single pair cloth drops needing to be replaced."

[19]The document defendants cite is dated August 3, 2004.

Defendants contend that Balthazar received a written warning from and was suspended for three days by Murphy because, on October 12, 2004, Balthazar improperly coded the status of two jobs in the repair tracking system and also because of the October 25, 2005 incident set forth above. Defendants' characterization of the October 12 incident in their Local Rule 56.1 statement is impossible to discern from the face of the document itself. Balthazar disputes this fact based on his deposition testimony that he called Murphy and asked to be taken off the job because he was in pain and would not be able to make it through the day, which is also reflected in the "Employee Response" section of the ED. Balthazar also testified that when he called Murphy agreed to give him an "EWD"[20] day, but when he returned to work Murphy asked him to take a "sick" day.[21] Defendants admit that Balthazar asked to leave early on October 12, 2004 and to have someone else take over his work.[22]

---

[20]This term is not defined or explained, but plaintiff testified that "it's better for the worker to use that [type of] day . . . . "

[21]To the extent defendants claim, without any citation to the record, that plaintiff "failed to corroborate his doctor's visit with necessary documentation[,]" plaintiff testified that he "was not asked for" any documents relating to his shoulder problem, such as a doctor's note; he "was not given a chance to provide that." Rather, he was told to return to work, and "[i]f I did not come back to work, I was going to be disciplined."

[22]To the extent defendants deny that Murphy knew plaintiff was sick or that plaintiff told Murphy he was sick, defendants fail to cite any support in the record. Rather, they rely only on the ED,

Defendants contend that Illinois Bell received a customer complaint about Balthazar's work performed on January 5, 2005. Murphy found that the wiring was done improperly both in terms of technical and aesthetic quality, including wires left visible and hanging loose in kitchen cabinets and a closet as well as along a ceiling. Murphy took pictures during his inspection, and then called Balthazar back to the job site and the work was redone. Balthazar testified that he did not see Murphy taking pictures and Murphy did not show him pictures. Regarding one of the pictures attached to the QI for this incident, Balthazar testified that it would "[a]bsolutely not" be appropriate to leave a wire hanging as seen in the picture because "[t]here is no reason[]" to do so.

On January 20, 2005, defendants claim Balthazar failed to properly code a job as inaccessible in the repair tracking system, resulting in a second technician's inability to perform the next phase of the work. Balthazar disputes this incident. He testified that he called Zielinski, told him that he had no access to the job, and wrote "gate is locked" in the "remark section" of some other document, but "they said I completed the job." Balthazar also attested that he found the trailer where the job was to be performed "surrounded by a fence and thereby inaccessible." He further attested that he "followed procedure by properly coding the situation and also called into the warehouse and spoke to . . .

which supports plaintiff's version of events.

15

Zielinski . . . about the situation." He further attested that,
"[a]pparently, the system was not updated to reflect that the first
of this two phase project was not complete and Technicians were
assigned to complete phase two." Defendants do not dispute that
"Balthazar wrote that a job was inaccessible on his worksheet[.]"[23]

On January 24, 2005, Murphy performed an inspection in
response to a customer complaint. Murphy found that a ground wire
was improperly installed running through a light fixture, and the
"Network Interface" was installed in the customer's basement rather
than outside so that it could be accessed when the customer is not
home. Balthazar disputes this incident, testifying that he told
Murphy "that the lady wanted me to put her NID inside the
basement." Balthazar testified that he told Murphy "[t]he same day
because I had to call him every hour." He further testified that
it is "[a]bsolutely not" appropriate to install a phone wire
running through an electric light fixture. Balthazar does not
dispute that he was suspended pending termination as a result of
the three January 2005 incidents. Balthazar's explanation for the
performance failures from February 13, 2004 to January 24, 2005 is
that no one can say for sure who is the last technician to perform

_____

[23]Defendants contend that it was not timely reported because
the Guide requires technicians to notify a supervisor "immediately"
if a job is inaccessible. The Guide is silent as to the timing of
notification, stating that, if an installation or repair order
cannot be completed for any reason, then "a manager must be
notified of the problems encountered."

work.[24]

When Illinois Bell contemplates dismissing an employee, he is suspended pending dismissal. The union may then request a Union Management Review Board (also called a "dismissal panel"). At the dismissal panel, area manager Lombardo and senior labor relations manager Stephen Hansen ("Hansen") represented Illinois Bell. Union representatives Steve Unterfranz ("Unterfranz") and Paul Wright as well as Balthazar were present. The union argued on Balthazar's behalf. Hansen began the dismissal panel by explaining that Balthazar was suspended pending termination for continued poor performance and violations of the Guide. During the dismissal panel, Illinois Bell provided copies of all the documents it intended to use to support its decision. The dismissal panel lasted for approximately nine hours. It was the longest dismissal panel Hansen ever attended.

A few days after the dismissal panel, Hansen, Murphy, Zielinski, and Lombardo participated in a conference call about Balthazar's termination. Hansen advised Murphy, Zielinski, and Lombardo that he felt they had just cause to terminate Balthazar. After their discussion, Murphy, Zielinski, and Lombardo "indicated that they wanted to hold with their decision to terminate" Balthazar. Hansen contacted Unterfranz to explain the company's

---

[24]Defendants cite a portion of plaintiff's deposition testimony that appears to be about a single document as opposed to all of the incidents, but plaintiff does not dispute this fact.

position and the ultimate decision.  A few days after the dismissal panel, Murphy notified Balthazar of his termination.

A grievance was filed relating to Balthazar's termination. The matter was submitted to arbitration on the issue of whether Illinois Bell had just cause to terminate Balthazar.  A two-day hearing was held, concluding on November 1, 2007.  The arbitrator ruled that Balthazar was terminated for just cause.  The arbitrator's opinion stated that, "In each incident for which the Grievant received discipline, the Company has proven that Grievant did, in fact, engage in the conduct for which he was disciplined. The opinion also stated that, "The evidence thus is overwhelming that over an 11-month period, Grievant exhibited a pattern of continued poor job performance despite being counseled and being progressively disciplined."  The opinion further stated that, "Regardless of whether Grievant's performance was acceptable to his former supervisors, his performance deficiencies over the 11-month period that he reported to Mr. Murphy are fully documented in the record, supported in most instances by contemporaneous photographs and undenied by Grievant at the arbitration hearing."

Balthazar testified that, from the time he began working for Illinois Bell to the time he was terminated, he "[n]ever called in sick" and was "[n]ever" late.  Balthazar also testified that, before Murphy, the other supervisors "[n]ever" disciplined him for his work.  Balthazar attested that, when he started working under

Murphy's supervision, Murphy "ridiculed my accent and demeaned my nationality stating, among other things, that my performance was substandard because I was Haitian."  Murphy testified that he did not mock Balthazar's accent.[25]

Balthazar identified the following non-black non-Haitian technicians as being treated more favorably: Todd Collum ("Collum"; Brian Feliciano ("Feliciano"); Robin Ficarra ("Ficarra"); Robert Netz ("Netz"); and Bryan Walling ("Walling").  However, he has produced no evidence to support these claims.  Balthazar attested that, from February 2004 to February 14, 2005 when he was terminated, Murphy "and other authorized agents of the Company" subjected him to "closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" unlike non-black non-Haitian technicians.  Netz was subjected to progressive discipline for poor attendance.  Ficarra was terminated.

The parties agree that Illinois Bell maintains quarterly statistical reports, referred to as "Bump Up Reports."[26]  The

_____

[25]To the extent defendants deny that Murphy demeaned plaintiff's nationality, they have not cited any record support.

[26]Only plaintiff's affidavit is offered to lay the foundation for or otherwise explain these documents.  But plaintiff has not demonstrated in his affidavit or elsewhere that he can properly attest to the significance of the "Bump Up Reports."  Defendants contend that these reports are not used to evaluate performance or impose discipline.  Defendants do not cite any record support for that contention, but rather rely on a letter from defendants' counsel to plaintiff's counsel during discovery conveying their

quarterly statistical reports for 2004 purport to indicate the
number of inspections of Balthazar's and the other technicians'
work, but the parties dispute the numbers of inspections for each
technician. Balthazar testified that "Malick, Jeff or Sheila" gave
him and "everybody" four or five jobs per day, but "under Murphy I
was six to seven."[27] The reports also contain a number of other
categories, based upon which Balthazar attested that his
performance was about average and was improving over time.[28]

Balthazar testified that a few weeks after Murphy became his
supervisor, Murphy told Balthazar to call him every two hours every
day.[29] Balthazar also attested that his "supervisors" required him
to call the office several times per day, but did not require the
same from non-black non-Haitian employees. Balthazar testified
that Murphy "would be visiting me every single day on several jobs
. . . . " Balthazar also attested that Murphy inspected his work

position regarding the import of the Bump Up Reports.

[27]Plaintiff also attested that the "Bump Up Reports" show that
he was "consistently" assigned more daily orders than non-black
non-Haitian technicians. But plaintiff has not demonstrated that
he can properly attest to what the "Bump Up Reports" show,
including concerning the technicians' number of daily assignments.
Defendants fail to cite any other support in the record showing the
number of daily assignments given to the technicians.

[28]Again, plaintiff has not established that he can attest to
this, but defendants provide no contrary record support regarding
what the documents show.

[29]Defendants' attempt to dispute this fact is not supported by
any citation to the record.

more frequently than other non-black non-Haitian technicians, and accompanied the inspection reports with "colorful vivid photographs" which he did not do for the other technicians.[30]

Balthazar testified that he knows what surveillance the other five technicians were subjected by Murphy because "[i]n the garage" the technicians "talk to each other . . . about what's going on with the managers . . . what they are doing to each other, to us." Balthazar testified that he did not see Murphy supervising any of these five technicians in the field. He also testified that he has no information, other than what the other five technicians told him, about how much Murphy supervised them. Whatever the other technicians told Balthazar is inadmissible hearsay. Plaintiff offers no deposition testimony or affidavits from the other

_____

[30]Plaintiff has not established that he can attest to this, and no inspection reports for other technicians have been included in the record. But defendants' attempt to dispute this fact is not supported by any citation to the record. Additionally, defendants admit that the pictures themselves do not indicate the addresses where the work was performed, but state that the associated addresses are documented in WebAd. As explained above, defendants did not properly lay the foundation for the WebAd documents, including the pictures, but plaintiff fails to object. Moreover, plaintiff's assertion that he "has denied that any of these photographs were of the customers' homes where he had worked and were of tasks he performed" is not supported by any citation to the record. Plaintiff has not attested as much, and the parties have not cited any such deposition testimony. In responding to defendants' statement of facts, plaintiff also contends that he "agrees that Murphy took pictures but disagrees that such pictures were of the work in question." Plaintiff likewise fails to support this statement with any citation to the record. As set forth above, the parties agree that plaintiff's explanation for all of the documented performance failures is that no one can say for sure who was the last technician to perform work.

technicians.

Balthazar testified that abusive verbal treatment means "[s]omebody talking down to you, somebody making fun of your accent, somebody swearing at you . . . . " When asked if he ever saw Murphy engage in abusive verbal treatment towards anyone besides him during his employment, Balthazar answered "Bolide Lherisson, yes." Balthazar testified that he observed Murphy engaging in abusive verbal treatment of Lherisson "while I was working in the garage." He testified that he saw Murphy "go after" Lherisson "[a]t least two times." When asked when that was, Balthazar testified that "[g]ot to be about two or three months after Mr. Murphy got to the garage." When asked what Murphy said to Lherisson, Balthazar testified that, "Once I recall he called him stupid, yeah. And the next time I'm sure he told me, is that the way you do it in Haiti?"[31] In response to the question "Do you know what he was referring to when he said that?", Balthazar answered

> I'm not sure, but it got to be for some work that he was
> doing. I'm not sure. I'm not sure. For his work, but
> that's the only thing they have together.[32]

---

[31]Plaintiff does not cite to other any portion of the record specifically indicating that Lherisson is Haitian. Plaintiff's response refers to Lherisson as Haitian. (*See* Pl.'s Resp. at 8.)

[32]The testimony generally appears to be about events plaintiff observed, but the foregoing question and answer are ambiguous. It is possible that plaintiff meant he heard Murphy say that to Lherisson. It is also possible that plaintiff meant Lherisson repeated something Murphy said to him, in which case it would be

In response to a question about what was discussed at some unspecified meeting,[33] Balthazar testified that Murphy "doesn't give me a chance to respond.  So when I'm talking, [Murphy] would even tease me on my accent."  When testifying that Murphy "called me in the office for" a May 10, 2004 incident, Balthazar also testified that "whenever [Murphy] called me into the office, he yells.  And my talking -- Maybe my talking, my accent, offends him.  So he yells . . . . "  Balthazar also testified that "when Mr. Murphy is with me, he yells words like, 'Stupid, you don't know what you're doing.  Do you think you're in Haiti now?'"  When asked whether there was any discussion about problems at the job, Balthazar testified as follows

> Not specifically to come to tell you, "Okay, this wire is done wrong, I'm going to write you up for that."  Not this way.  "You're stupid."  That's the way he talks to me.  "You're stupid.  What do you think you're doing?"  And making fun of my accent.  That's the way I have been with Mr. Murphy in the meetings.

Balthazar further testified that, "On several occasions Mr. Murphy would ask me if I, if I think I'm in Haiti now."  When asked to share "a context" in which Murphy said that, Balthazar testified as follows

> He would complain about the job.  He asked me, do you think you're in Haiti?  Or do you think is that the way they do it in Haiti?  It's that context.

inadmissible hearsay.

[33]Defendants have not attached the surrounding transcript pages from which to determine to what meeting the question refers.

II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A plaintiff may defeat summary judgment with his deposition testimony. *Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir. 2006) (finding plaintiff's deposition was filled with genuine issues of fact based on personal knowledge). Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R.

CIV. P. 56(e)(1). A plaintiff cannot create an issue of material fact by submitting an affidavit that contradicts earlier deposition testimony. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) (citation omitted). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

Title VII precludes, in relevant part, employers from discharging or otherwise discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981(a) provides, in relevant part, that all persons shall have the same right to make and enforce contracts as "enjoyed by white citizens[.]"[34] 42 U.S.C. § 1981(a). Section 1981 claims are

---

[34]Plaintiff bases his § 1981 claims on race and national origin. On its face, § 1981 does not include discrimination based on national origin, but such claims may be appropriate. *See Abdullahi v. Prada USA Corp.*, 520 F.3d 710 (7th Cir. 2008) (explaining that race, nationality, and ethnicity are sometimes correlated, but not synonymous); *Pourghoraishi*, 449 F.3d at 756-57 (considering "matter of race broadly[,]" and concluding it encompasses persons of Iranian ancestry); *see also Derosena v. Gen. Bd. of Pensions & Health Benefits of the United Methodist Church, Inc.*, 560 F. Supp. 2d 652, 656 n.1 (N.D. Ill. 2008) (Kendall, J.) (construing § 1981 claim as based on national origin rather than race where alleged discrimination concerned plaintiff's ancestors' place of origin as well as characteristics she possessed as result of membership in Haitian national origin group). Here, defendants do not argue that a § 1981 claim based on national origin should not be allowed.

25

evaluated "under the same rubric Title VII claims[.]" *Herron v. Daimlerchryslter Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) (citing *Williams v. Waste Mgmt. of Illinois Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004)). Therefore, I need not address the § 1981 claims separately. *Id.*

### A. Counts II and IV

I first address the discrimination claims. In count II, Balthazar alleges that Illinois Bell discharged him based on his race, color, and nationality in violation of Title VII. In count IV, Balthazar alleges that Murphy interfered with and prevented him from enjoying the same rights to make and enforce contracts as non-black and non-Haitians in violation of § 1981. Intentional discrimination can be proven under either the direct or indirect method. *Id.* Illinois Bell and Murphy contend that Balthazar offers no direct evidence of discrimination. Balthazar's response indicates that he is proceeding under the indirect method.[35]

The indirect method of proof relies on the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Herron*, 388 F.3d at 299. To establish a *prima facie* case under the indirect method, plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting his

---

[35]Plaintiff confines his argument to establishing that he has made out a *prima facie* case of discrimination and that defendants' proffered reason for his termination was pretextual. (Pl.'s Resp. at 7-12.) Plaintiff sets forth cases discussing the indirect method's burden-shifting analysis. (*Id.* at 5-6.)

employer's legitimate expectations; (3) his employer took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside the protected class more favorably. *Id.* If plaintiff meets this burden, then defendants must articulate a "legitimate, non-discriminatory reason" for their actions. *Id.* If defendants provide such a reason, then the burden remains with plaintiff "to show that the reason put forth was not a true reason, but a pretext—'a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (citation omitted).

Defendants do not dispute that Balthazar is a member of a protected class and that he suffered an adverse employment action. Defendants argue that Balthazar cannot establish a *prima facie* case because he cannot show that he performed his job satisfactorily and that any similarly-situated non-black non-Haitian employees were treated more favorably. Defendants further argue that, even if Balthazar could establish a *prima facie* case, he still cannot demonstrate pretext.

With regard to whether Balthazar was performing his job satisfactorily, defendants assert that Balthazar has not offered any evidence other than his own opinion that he was meeting performance expectations. Additionally, as evidence of Balthazar's deficient performance, defendants cite all the incidents documented in WebAd by Murphy and Zielinski - five of which they contend "were

brought to the Company's attention through" customer complaints[36] and the rest of which they contend were discovered through routine quality inspections.[37]  Defendants also argue that Balthazar's only justification for the performance failures is that unknown technicians were responsible.  Moreover, defendants argue that even if Balthazar could show that other unknown technicians were responsible, he has not shown that Murphy and Zielinski lacked a good faith belief that it was Balthazar's work.[38]

---

[36]Defendants fail to specify to which five incidents they refer, instead citing to all thirty-three statements of facts regarding the WebAd documents generally.

[37]Defendants again generally cite to all thirty-three statements of facts regarding the WebAd documents, but fail to identify what portion of the record, if any, indicates that the quality inspections were routine.

[38]Defendants further argue that the arbitrator's ruling that Illinois Bell had just cause to terminate Balthazar undermines the argument that his termination was improper.  Defendants contend that I "must give 'great weight' to" the arbitrator's ruling, relying on *Darden v. Illinois Bell Tel. Co.*, 797 F.2d 497, 504 (7th Cir. 1986).  In *Darden*, the Seventh Circuit concluded that an arbitrator's decision on a Title VII claim was not entitled to complete deference.  797 F.2d at 504.  The court explained that the Supreme Court did not hold what specific weight should be given to an arbitrator's decision, but rather "stated that a court could accord 'great weight' to a determination that gave full consideration to the Title VII claim."  *Id.* (citing *Alexander v. Gardner-Denver*, 415 U.S. 36 (1974)).  The court found that the "great weight" standard was appropriate where "the arbitrator clearly construed the collective bargaining agreement in accord with Title VII to proscribe racially discriminatory and retaliatory discharges, and thus fully considered [the plaintiff's] Title VII claim."  *Id.*  That standard is not appropriate here, as the arbitrator dealt solely with the issue of whether the termination was for just cause based on plaintiff's performance - not whether the termination was discriminatory based on plaintiff's race and/or national origin.

Balthazar first asserts that he was performing his job satisfactorily based on his deposition testimony that, from the time he was hired until the time he was terminated, he never called in sick or was late to work, and his other supervisors prior to Murphy did not discipline him for his work.[39] Balthazar also contends that, even under Murphy's supervision, his performance as reflected in the "Bump Up Reports" showed that he was performing his job reasonably well based on the statistics contained therein.

As an initial matter, Balthazar does not account for at least six undisputed incidents of deficient performance. Moreover, to the extent Balthazar disputes the remaining incidents as possibly the work of some other unidentified technician(s), no supporting evidence of that has been adduced. Nevertheless, taken in the light most favorable to Balthazar, the substance of other incidents is disputed, including several of the incidents that led to his suspension pending termination. As for the Bump Up Reports, regardless of what Illinois Bell claims the reports are used for, they may be some evidence that Balthazar was meeting Illinois

---

[39]Plaintiff's additional claim that he did not receive customer complaints before being supervised by Murphy is not supported by the accompanying citation to the record. (*See* Pl.'s Resp. at 7.) Although plaintiff's Local Rule 56.1 statement says that he "never had any customer complaints against him" before being supervised by Murphy, the cited portions of plaintiff's deposition testimony do not support that statement. Rather, the cited portions of plaintiff's deposition only show that he testified that he was "[n]ever" late for work, he "[n]ever called in sick," and his prior supervisors "[n]ever" disciplined him for his work.

Bell's performance expectations.

With regard to whether similarly-situated non-black non-Haitian employees were treated more favorably, defendants argue that Balthazar's position that Collum, Feliciano, Ficarra, Netz, and Walling were treated more favorably is based on Balthazar's "self-serving" opinions, which lack foundation and therefore are inadmissible. Defendants also contend that Balthazar was not subjected to extraordinary surveillance based on the numbers of quality inspections and safety inspections reflected in the Bump Up Reports for him, Walling, Ficarra, Netz, and Feliciano. Defendants also argue that Balthazar has not presented evidence that any of the other five technicians' performance was as poor as his; moreover, Netz was subjected to progressive discipline for poor attendance and Ficarra was terminated.

Balthazar cites his answers to interrogatories as evidence that the five non-black non-Haitian technicians identified there were treated more favorably than he was. He attested that, for one year up to his termination, Murphy "and other authorized agents of the Company" subjected him to "closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" unlike non-black non-Haitian technicians.[40] Balthazar does not cite

---

[40]Plaintiff's response states that Lherisson "suffered adverse employment discrimination[]" and "was reinstated through union intervention[,]" (pl.'s resp. at 8) but plaintiff fails to cite any

admissible evidence of the surveillance of other technicians. Balthazar also does not cite admissible evidence that other technicians' inspection reports were not accompanied by photographs, nor has he introduced any other technicians' inspection reports. Balthazar also presents no admissible evidence of the other technicians' number of daily assignments.

Balthazar additionally generally cites the Bump Up Reports, which he claims show that: Netz, Ficarra, Walling, and Collum "received preferential treatment[;]" Netz "had a significant attendance problem[,]" but was not terminated; Walling had "less daily orders" and "a higher percentage of over time[,]" but did not suffer an adverse employment action; Collum "received many less daily orders[,]" but received a much higher rating. (Pl.'s Resp. at 8.) Balthazar also lists his performance ratings as well as the ratings of two other employees in the Bump Up Reports. (*See id.* at 9-10.) To the extent the Bump Up Reports provide evidence of the numbers of inspections to which the technicians were subjected, the parties dispute these numbers. Although it is unclear exactly what the Bump Up Reports say, it is undisputed that they demonstrate that all technicians were subject to inspection. Nevertheless, there is no evidence in the record that any other technician received a negative performance evaluation yet was not subject to any discipline. Additionally, it is undisputed that one

_____

support in the record.

technician, Netz, was disciplined for poor performance and another, Ficarra, was terminated for an unspecified reason. Thus, Balthazar has not shown that similarly situated individuals outside the protected class were treated more favorably.

Balthazar has not met his burden of establishing a *prima facie* case of discrimination. Therefore, defendants do not have to articulate a legitimate non-discriminatory reason for his termination. As such, I need not address whether the reason proffered is pretextual.

### B. Counts I and III

I next address the harassment claims. In count I, Balthazar alleges that Illinois Bell, through Murphy, subjected him to "closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" based on his race, color, and nationality in violation of Title VII. In count III, Balthazar alleges that as Illinois Bell engaged in "unwarranted harassment, including but not limited to closer scrutiny, surveillance, unreasonable workloads, verbal abuses, cursing, discriminatory complaints, conduct, suspension and eventual termination" and prevented him from enjoying the same rights to make and enforce contracts as enjoyed by whites, non-blacks, and non-Haitians in violation of § 1981.

For harassment claims, plaintiff must show that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on

his race or national origin; (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive environment; and (4) there is a basis for employer liability. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (setting forth what plaintiff must establish to survive summary judgment on hostile work environment claim based on national origin); *Herron*, 388 F.3d at 302 (setting forth what plaintiff must show to succeed on claim of racial harassment due to hostile work environment). The conduct must be "sufficiently severe or pervasive that a reasonable person would find it hostile" and the victim himself subjectively must see it as abusive. *Andonissamy*, 547 F.3d at 847 (quotation omitted); *see Herron*, 388 F.3d at 302.

Illinois Bell argues that Balthazar's allegations are based on his deposition testimony that Murphy mocked his accent and asked him if he thought he was in Haiti or if that was the way something is done in Haiti. Illinois Bell argues that such conduct would not constitute a hostile work environment.[41] Balthazar fails to respond to defendants' arguments regarding the harassment claims. The conduct Balthazar alleged in connection with the discrimination

---

[41]To the extent Illinois Bell argues that it cannot be held liable because plaintiff did not use its harassment complaint procedures, it misstates the law regarding employer liability for a supervisor's actions. *See Williams*, 361 F.3d at 1029 (stating that "Employers are strictly liable for harassment inflicted by supervisors, subject to an affirmative defense when the harassment does not result in a tangible employment action.").

claims also relates to the harassment claims, including being subjected to frequent supervision, being assigned more work than other employees, and Murphy's comments. Balthazar has cited no legal authority finding such conduct so severe and pervasive as to create a hostile and abusive environment. In deciding whether a hostile environment exists, I must evaluate the totality of the circumstances, including the frequency of the alleged discriminatory conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with Balthazar's work performance. *Herron*, 388 F.3d at 303. I find that Balthazar's "allegations do not place him in any of the multiple levels of workplace trauma that would establish actionable harassment." *Id.*

IV.

For the foregoing reasons, defendants' motion for summary judgment is granted.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: March 31, 2009